Thank you, Your Honor. May it please the Court, Steve Berman on behalf of the Consumer Plaintiffs. I'm splitting this argument with the other plaintiff in the case, and I'd like to reserve two minutes on reply. The District Court, and the primary ruling by the District Court, was that the plaintiffs had failed to plead that the doctors believed the marketing materials put out by InterMune, and therefore we failed to plead causation, that we purchased this drug as a result of illegal marketing activity. And we think that that was error for two reasons. First, under the Kwikset case we submit, which came out after the District Court's opinion, all we had to allege was that we were exposed to an unlawful and unfair practice, and that we would not have paid for that drug but for the injury that flowed from that unlawful practice, namely we paid for the drug. That's all, if you look at the Kwikset case, all the Court required to plead causation under the UCL. I think I may have missed something. Injury that flowed from what? From the unlawful conduct, which in this case was promoting a drug. Well, how is that different? Why is not that the same as, as a result of, require a causative element? And what I'm saying, Your Honor, is that we pled exactly that, that we bought the drug as a result of the unlawful conduct, and under Kwikset. Well, what exactly was the pleading? What did you say in the pleading? That's exactly what we said. And the District Court called that formulaic and not enough, that we had to have further facts. She said we had to plead that the doctors believed in the marketing materials and, therefore, that's why they prescribed the drug. And we did allege that the doctors were exposed to the advertising, and as a result of that advertising, they prescribed the drug. The District Court judge found that was too formulaic. And we also allege that the doctors told their patients, and this is at ER 205 and 206, that they believed the drug was effective. So the issue really is, did we plausibly state why the doctors believed the drug was effective? Well, Kwikset involved a direct communication to the consumer. This does not. Yes. So why do you think Kwikset controls? Because here we've alleged a chain very similar to Kwikset that leads from the wrongful conduct to purchasing the drug, which is the injury. And the chain is as follows. We're on a plausibility standard. And what we alleged is eight facts which I think establish a plausible chain. And just let me tick them off if I can. The first is we have a drug here that was approved just for two uses, not for lung uses. We allege that the company comes in, it embarks on an aggressive marketing campaign to promote the drug. And Judge Patel found that we alleged with sufficient specificity that they had falsely promoted the drug. That was not the issue. Third plausible event in the chain of causation. You have a patient and doctor population that are desperate for a drug because they're both facing an incurable disease. Fourth element, the aggressive promotion. This company bragged that they called on every pulmonologist in America seven times. They had no reason to call on these pulmonologists other than to promote their drug off-label. We allege that it was successful. The doctors prescribed. And the key fact here, I think, that distinguishes this from any other drug case I've been involved in, is there was no other information in the marketplace promoting this drug except for the information put out by the company. This is very unusual. You take a case like Vioxx, which you've all read about. In the Vioxx case, you have academicians and doctors from all over the world writing articles about how Vioxx might be used for various purposes. And so a doctor may have read one of those articles and not relied on the marketing materials. Here, the only information that a doctor had about this drug was from this company. And therefore, you couple that with the fact that a doctor, Hippocratic Oath says you have to do more good than harm. What does that mean here? A doctor would not have prescribed it for a patient, a drug with serious toxic side effects, unless the doctor believed it would help. And again, that belief comes from the only source of information about the drug, the defendant in this case. We also have, in the plausibility factor, two other facts I'd like to mention. One is the sales chart, and that's at ER-210. Sometimes a picture's worth a thousand words. That chart's worth a thousand words. It shows that when they started promoting this drug, the sales went from nonexistent to tens and hundreds of millions of dollars, direct causation. And when the drug – when the criminal proceedings started, the drug was no longer prescribed. It shows that the sales promotion worked and doctors relied on it. The last thing that we have in plausibility is we have an indictment of the company for wrongful promotion, and we have the conviction of the CEO for wire fraud. Now, when you're in a district court, one of the things that district courts often do, for example, in antitrust cases, is to take a look at government pleadings, because there's a high burden on the government to bring an indictment. And here they brought an indictment, a plausibility fact in our favor. And finally, I think critical to draw the inference here that links the chain of causation is the plaintiffs were told, and I'll repeat this. I know I've already said it once. They were told by the doctors that they believed the drug was effective. Now, I don't think that we were required to plead more about why the doctors did what they did. They're third parties. There's reasons why doctors would not want to admit that they had made a mistake in prescribing this drug. We don't have to plead the state of mind of these doctors. We've been – We don't have to plead reliance, though. I mean, if all the – I mean, if the doctors didn't rely on the representations, then your case goes away. And that may be true when we take discovery. Well, perhaps. But as of now, you have no idea whether they relied on this or not. Well, as of now, I think what we have is a reasonable inference that because the only source of this information came from the company that promoted the drug, and because a doctor would not promote something he didn't believe in, that it's reasonable to infer reliance. And therefore, that's where we think the trial court erred. And in fact, if you look at the decision in the Tobacco II case, the Tobacco II court held that an inference of reliance arises when a reasonable person would attach importance to a misrepresentation. Again, here it's reasonable to infer that no doctor, without believing the information that came from this company, would prescribe it for a patient. It just goes against their Hippocratic oath. They had to believe in it, and that belief came from the information from the company. With that said, Your Honors, I'm going to rest now and save the rest for replying. Thank you.  Good morning, Your Honor. May it please the Court, Peter St. Philip, White Plains, New York, for the Plaintiff Government Employees Health Association, ag. What I would add, in connection with the third-party payer case, is that the district  payer case. of how she analyzed the causation chain of events that we pled. She said, with respect to Geha's complaint, we had alleged that 10 of the 50 pulmonologists that prescribed to our members the 628 prescriptions in total had participated with Intermune in connection with their IPF promotional efforts. And the district court found, essentially, that we had pleaded ourselves out of a causation case with respect to those allegations because, and I quote, the absence of any allegations linking defendants' off-label marketing of Act-Immune to the doctor's decision, Dooms, to prescribe Act-Immune for IPF Dooms Geha's claims. Well, that was exactly what the allegation said, was that they worked with Intermune in connection with the promotion for IPF. Now, remember, IPF was the off-label marketing efforts. So with respect to the district court's causation conclusion in connection with Geha's complaint, I think she just misread those claims. The one other thing that I would like to add to the briefs was that we alleged a claim under the Missouri Merchandise Practicing Act. And the district court determined that the causation standards under that act were low. But she found that when you looked at the claim, there was a need for the plaintiffs to state that it was used, the merchandise, that issue, were used, and this is a statutory formulation, for family or individual purposes. Now, under the act, and the district court got this correct, corporations are defined as persons. Yet she found that because the corporation, in this case Geha, purchased it for the use of someone else, that the corporation didn't meet that qualifying standard. What we have said in the briefs is that if that line of rationale is taken to its conclusion, corporations would be written out of that statutory definition, because corporations are not persons and they purchase and they don't purchase as such. So with that, unless the Court has other questions. Thank you. You're welcome. Good morning. May it please the Court. Do you have a time allocation among you or? Yes, Your Honor. I was going to tell you I'm going to take about 10 minutes. All right. I believe Mr. Zweifach for Genentech is going to take about 7 or 8 minutes, and Mr. Haddad for Dr. Harkin is going to take about 2 or 3. Okay. Manager, on time. Go ahead. Thank you. May it please the Court. Simon Frankel of Covington & Burling for Appellee Interim Union. Judge Patel gave the plaintiffs multiple opportunities here to plead the required facts. In her first public opinion, a published decision, her first of three lengthy written opinions, she told them exactly what they needed to do to plead claims under the State law standards and the applicable Federal pleading requirements, that their physicians prescribed Act-Immune for them in reliance on defendants' alleged off-label marketing, not other conduct of defendants, and not because of the studies that existed starting in 1999 that showed that Act-Immune might be promising as a treatment for IPF and otherwise incurable and fatal disease. This standard was compelled by Section 17200 after Proposition 64, which requires, given the decisions in Tobacco II and Kwikset, that a plaintiff who claims that they were injured as a result of statements by the defendant allege that they relied on them or hear that their agents relied on them, meaning that the doctors relied on them, on those statements, and as a result the plaintiffs were injured. And Kwikset and Tobacco II are very clear that that means that it was a but-for cause of the plaintiff's alleged injury. Why is counsel incorrect in his suggestion that the law permits a reasonable inference where the statements are shown to be, or at least alleged to be, patently false? Your Honor, two reasons. One is that that's not what Tobacco II and Kwikset say. Tobacco II actually refers to the need to plead individual reliance on specific representations or false statements, and that's exactly what the district court required here and exactly what they could not do. What they have said is in general there were false statements out there, and these plaintiffs or their doctors relied on them. But there is no allegation that these plaintiffs' doctors actually relied. So what would they, in your view, have had to do? Go do pre-filing depositions, which are permitted under the rules of doctors, and then burden the complaint with that information? Is that what the idea is? Your Honor, this would not have been a great burden. They would have had to go out for the individual plaintiffs. I'm not suggesting – I use that term generally. Yes. They would have had to go out and ask the patients, the main plaintiffs, and their doctors. And the record actually shows that they didn't even do that. They didn't even ask them. They represent to the district court that they talked to some of the doctors and the doctors didn't cooperate. Well, no. What they said is that the doctors they talked to didn't give them the facts they needed. Well, right. What's the difference? They may investigate it.  have the facts to plead a claim. Well, what's the alternative hypothesis on where the doctors got the information from your point of view? Absolutely, Your Honor. Your Honor, the appellant said this, that the only source of information was the false statements from the defendants. And that's not what their own complaints show at all. They show exactly the opposite. They show that there was a 1999 study that found that this drug was promising, might be helpful for the treatment of an otherwise incurable and fatal disease. And in the years following that, there were a series of articles, and these are all in the record, in the supplemental excerpts of record, starting at 137. There were articles that said more studies needed, this may be promising, here's why the data shows it. Now, they have said some of these studies were funded by defendants, but there's nothing improper in funding scientific studies. Right. So, but we won't know until the doctors are deposed exactly upon which they relied, right? Right. But, Your Honor, they have to plead that they make the decision. I understand that, but I'm just — you're answering a question I didn't ask. We won't — I mean, if the case gets that far, we actually will not know the material on why the doctors made the decision until we ask them, right, until someone asks them. That may be, Your Honor, but they have asked them and the doctors said they made it, and this is what all the decisions are. Well, they asked — you start off by saying they didn't investigate. They did investigate, and they didn't get cooperation. I mean, the problem is they may have a reasonable inference here that will get them to discovery. You've answered my question about what the alternative hypothesis is on how they got the information. All I said was we really won't know for sure or wouldn't know for sure until you have the doctors under oath on why they made their decision. Your Honor, I think we have to get to the next step, which is the Federal pleading overlay, which just — I'm just taking this one step at a time.  No, no. I accept that. No, I mean, so if we don't know the truth yet, the question is have they pled enough to get to the second step. Yeah. And under Tobacco II and Kwikset, they haven't. In Kwikset, you had the label. The label was what the plaintiff said was misleading. Here it is off-label marketing. So by its nature, they can't simply point to the label and say, as the plaintiffs in Kwikset did, it said Made in USA. I relied on that. They have to say my doctor relied on, and then there's a big gap here. They don't say what it is their doctors relied on. For several of the plaintiffs, for Jarrett, there's not even a claim of that he got — that his doctor got any information. For Eisenhower and Rybkowski, there's no claim that they got specific information, let alone that they relied on it. And then they just haven't connected the dots. And if you look at the cases like the Ironworkers case from Florida and the District 1999-P from New Jersey and the Rivera from the Fifth Circuit and the In Re Yaz Marketing from the Southern District of Illinois, they all say at this same stage of the pleadings, we presume doctors rely on a range of available information, the scientific literature, and you can't simply assert that they relied on misrepresentations. Here there were these scientific studies, and even if you look at the articles from 2003, 2004, which are in the supplemental excerpts of records starting at 147, several articles that they identify as independent comment on the enthusiasm in the literature and the interest in this — in Actimune as a promising drug for IPF. And in light of the Iqbal standard that plaintiffs have to plead — If it applies. Excuse me? If it applies here. It applies here, but, Your Honor, specifically what it requires is that they plead facts that, if true, entitle them to relief. That's what the plausibility standard is. It's not just a claim that is consistent. And Iqbal's very clear on this. It can't just be that the facts they've pled are consistent with illegal conduct. It has to be that they're inconsistent with legal conduct. And that's exactly what Iqbal said, is they say that the Attorney General had a discriminatory motive. They say that, but the facts show that there's another explanation for why the policy had an impact on Arab Muslims. And that's exactly true here. There's a whole story. You could not get this medication without a prescription from a doctor, and the doctors had good reason in the years at issue to prescribe this medication for an otherwise incurable and fatal disease. And so this idea that there's no other information in the marketplace just isn't true, because if you look at their own pleadings, they establish that there's this other information. And if you look at the chart that Mr. Berman referred to, you also see that this takeoff in sales actually precedes what they allege is the off-label marketing, which they allege starts in 2002. And they allege some conduct before that, but it's all appropriate conduct like funding clinical studies that you can't claim is improper. And so this idea that there's an obvious inference just is not – is not only not supported by their pleadings, it's actually contradicted by it. And so Judge Patel held them to exactly the right standard, which was they had to plead facts that showed that their prescriptions were written as a result of representations on which their physicians relied. And you're right, they did go and ask the doctors. After they'd already filed two complaints, after her first opinion, they went. But they admitted they could not get the facts. And that means they don't plead their case. It doesn't entitle them to discovery. And Iqbal is very clear on that. You have to plead the required elements before you get to discovery. You don't get to discovery so you can plead the required elements. Just very briefly on the Missouri Practices Act, I think this has been fully addressed by the Express Scripts decision from the District of Missouri and also by the In-Rate Pharmacy Benefits decision from the District of Massachusetts, which was construing that statute. A person – excuse me, a corporation can be a person under the statute, but it has to be purchased for personal use, and that means for the use of the person.  And it was purchased for personal use. It was not purchased for Jihad's use. It was purchased for the individual patient's use. And I'll stop there. Very good. Thank you. Thank you. Good morning. May it please the Court, my name is Gerson Zweifack. With me is my partner, Jessamine Berneker, and I represent Genentech. In the consumer plaintiff's reply at page 2, they write that it would be hard to imagine anything more Genentech could have done, short of pulling the trigger to merit being joined as a defendant in this case. And I submit that actually it's not hard to imagine at all, because the case law specifies the conduct that's necessary to support a claim for either direct liability or for aiding and abetting liability. And for direct liability, the plaintiffs had to plead personal involvement in and unbridled control over the illegal activity. For aider and abetter, it's actual knowledge of and substantial assistance to the specific primary wrong. And there is only one wrong at issue in this case. It's the marketing. It's not the licensing agreement that directed Intermune to comply with all Federal law, and it's not even off-label sales, which are themselves entirely lawful. It's just the marketing. And Genentech, by their admission, had nothing to do with the marketing of Actimune. They pleaded in their complaint four times over the two years that the pleadings went on in this case that Genentech got out of the business of marketing in 1998. So how do they justify in this Court trying to bring Genentech back in? Well, on the knowledge element, they say that Genentech knew or should have known what was going on. Of course, knew or should have known itself on its face doesn't meet the knowledge requirement. But Judge Patel went through their allegations on knowledge and demonstrated the legal errors that were packed into them. But it's on the issue of substantial assistance to the primary wrong that their Aider and Abetter claims just run aground. So what do they say on how did Genentech, which had nothing to do with marketing, substantially assist the primary wrong here? Well, what they say, and it's on page excerpts of record 218, paragraphs 207 and 208 of the Third Amendment complaint, what they say is Genentech manufactured Actimune. And this was absolutely critical. Without the drug, the marketing couldn't take place. And they go on to say that Genentech manufactured and supplied Actimune with the product through May 2001. And I submit those allegations in the context of the complaint, they collapse on themselves, and here's why. They say that Genentech manufactured through May 2001, and they even admit that as of case by way of marketing activity, is after January 2002. So the press conferences, the meta-study, the detailing to all the pulmonologists, all that is after Genentech is not only out of the business of marketing, we're not even manufacturing. So it is demonstrably false that Genentech's manufacture was somehow critical or inextricably linked to the primary wrong in this case. They concede that's not true by the pleadings in their filing. And even if it were true, even if it were true that Genentech was manufacturing during the period of the marketing, it is a matter of law that providing a lawfully manufactured product or service to a primary violator does not make you an aider and abetter, does not mean you have substantially assisted the primary wrong. This Court, in the Perfect Ten case, and the Court of Appeal in Schultz v. Novi Data, dealt with similar kinds of claims against banks or financial institutions which provided either a banking function or an Internet capability to pay it, like PayPal, to someone who was involved in sort of widespread copyright violations or running a foreign lottery. And the Court of Appeal said in that case, even if the bank was on notice of the wrongdoing and even if it was profiting, in effect, because its customer was paying it fees, that does not make it an aider and abetter of the specific primary wrong. So even if it were true, and it isn't, that Genentech was manufacturing during the relevant period in question, that would not suffice to make Genentech an aider and abetter because it did not assist the marketing. I looked for, but I didn't see, maybe it's there, allegations of some sort of civil conspiracy between Genentech and the other defendants. Right. And those were, I guess, in an initial complaint, the civil RICO complaint. Right. And the conspiracy allegations were dismissed by Judge Patel. And they're not appealing. They're not appealing that way. That judgment. And I should add, the U.S. Attorney's Office investigated this matter for years before the criminal action which triggers the follow-on civil case. And there's never a suggestion that Genentech had anything to do with it. Now, even though there is no reference in their opening brief as to why they're seeking to reinstate the case against us, in their reply brief they say, recent evidence from the Harkonnen trial supports bringing Genentech back. And I submit it's not recent. The Harkonnen trial was in September 2009, which is not just before the opening brief was filed in this case. It was seven months before the Third Amendment complaint was filed. And what they cite as this critical new evidence is a stipulation to the effect that Genentech was involved in marketing, in manufacturing up through 2003, which they admit in their complaint isn't true. In the record in this case, they say Genentech was out of the manufacturing business no later than January 2002. That's paragraph 49. And they cite a letter which in the text of the reply brief, they say, says that Intermune told Genentech about the off-label marketing. If you look at the footnote describing the letter, it's a little more cautious. It says a draft was prepared and it talked about off-label sales, not about marketing. And so what happened here, in effect, is that over four pleadings over two years, an experienced trial judge finally took no for an answer. If I have 30 seconds, I just want to address one point that came up because we have an abiding interest in this case being affirmed in all respects because we'll inevitably be dragged back in in discovery. I think it's critical to know that what was represented to you, that every piece of information in this system that could have found its way to a doctor, every piece of information that would support writing these prescriptions came from Intermune, is just demonstrably not true. It's simply not true. And Judge Patel had every right to look at the literature, and she did, because it was cited in the complaint. And she said that the leading medical journal in the world published a study that said that there was this drug that may be promising for an otherwise fatal disease. And if you look in the supplemental excerpts of record, the Mayo Clinic studies, pages 148 to 153, they say, even on the follow-on studies, that while some aspects of them were disappointing, there was a statistically significant survival benefit. Those are studies that they characterize in their pleading in this case as being needed for reliance, because it was in that context where you've got literature in the field that doctors have a right to rely upon, that this trial judge asked the question, so tell me, what was it? Was it the science and the literature, or was it these visits by their salesmen? Can you tell us? She did not set a tremendous burden. She said you've got five plaintiffs. It's five doctors. Which was it? Was it the literature or was it the visits that she got back only added to her concerns? What she got back was a story that, well, this doctor's a member of that organization. He might have been exposed to this. Or that doctor's a member of that organization. He might have been exposed to that. But no one could squarely say in words of one syllable, my doctor wrote the prescription because he got that visit, and that's what persuaded him. So I submit the context in which Judge Patel looked at the allegations of reliance is critically important, and it really all begins with the fact that there was literature out there that supported the prescription by the doctors through a completely sort of lawful causal chain. Thank you very much. May it please the Court. My name is Mark Haddad, and I represent Dr. Scott Harkonnen. And I would like to make three points that are particularly pertinent to Dr. Harkonnen and are reasons to affirm the district court's judgment as to him. The first is with regard to the UCL and FAL.  There is an independent ground to affirm the dismissal of those claims as against him. And that is that an individual former officer of a company may not be held liable in a private party UCL or FAL suit because the remedies available are not remedies that private plaintiffs can get against an individual officer for the kind of company's alleged violations. And the case that lays this out in detail is the Bradstreet case that we have cited in our briefs. And that makes clear that while an individual may be liable in a FAL or UCL suit brought by a public entity for civil penalties, there's no remedy of restitution and no remedy of injunctive relief, obviously no injunctive relief, because we have a former officer and no restitution because the company is the one that received the monies and would disgorge the monies if a violation was found. Now, plaintiffs have argued in their reply brief that Bradstreet should not be looked at because the holding there followed a factual finding from the trial court. But the only reason there needed to be factual findings in that case was because the company there was insolvent and the plaintiffs made arguments about the individuals taking money out of the company that was owed to employees. But here they've made no allegations of any insolvency, of any alter ego, of any of the kinds of exceptions that could merit any factual findings. So Bradstreet covers this case. Finally, the plaintiffs – the cases that the plaintiffs cite are completely inapplicable. Those are cases where companies try to invoke a pass-on defense, and those courts rejected that. But that would be as if Intermune said it's not liable because the plaintiffs paid their money to a pharmacy, and that kind of defense has been rejected. But there's no case that supports the UCL or FAL liability being transferred from the company to its officers or employees. So that's our first point. Right. But you're about a minute over time now. I'll be concise. So if you're going to get to your last two points, you better do it in 30 seconds. Thank you, Your Honor. With respect to the CLRA, which is the only remaining claim against Dr. Harkin, I urge the Court to look at paragraphs 184, which – 186 to begin with. And this is really – has broad applicability. There the allegations are clear about what happened in the doctor's office, what the doctor specifically for Ms. Stevens, Plaintiff Stevens, was told. He was told that Act-Immune was a promising treatment for IPF. And as the trial court recognized, that is a true statement. In 2001, Act-Immune was a promising treatment for IPF. There can be no liability for Dr. Harkin or any of the defendants under the CLRA for true statements made. Your last point. And the last point is that the criminal conviction of Dr. Harkin provides no basis for liability here because the FAL and UCL claims have an element of restitution, which was not required in the criminal case. And, in fact, which the government conceded it could not prove, as our 20HA letter shows. And the CLRA and all of the claims require causation of financial loss. And, again, in the government case against Dr. Harkin, that did not need to be proved and the government was unable to prove it. Thank you.  May it please the Court, the standard on causation under Kwikset and the Braden case, 588F3rd at 596, is that, quote, does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct. That's what counsel is trying to do. They're trying to say you've got to take every single study and rule it out in your complaint. All we have to do is come forward with a plausible theory of causation. There's one study that they say breaks this chain. It was a 1999 study. And we allege that the study was so insufficient that no doctor would have relied upon it. All other information, and I know you're going to examine the record, came from the company and was positive. Counsel, can I ask you a question? And I think Judge Thomas had a ball-ping hammer and hit the nail right on the head. Does Iqbal apply in this case or not? I don't believe it does. I think Iqbal, in my view, as some judges have done, limited Iqbal to the very specific facts of the government prosecution activities that were at issue in that case. Well, I guess the question that I would have is, does it apply to a diversity action, State claims? That was my question. State statutory claims. We're proceeding under the theory that the Twombly standard and the Iqbal standard do apply in this case. You believe they do apply? But we believe that you can look to the California courts when they're interpreting the UCL to see what kind of standards they require. And, again, it is a plausibility standard, and Twombly says you just have to show plausibility, not probability. And with the lineup of studies and promotion of the study, I suppose, but Twombly says you just have to show probability. Actually, they made an argument that's very similar to the argument you're making here. Yes. And the Supreme Court said no. Well, I think Twombly said that it has to be more probable than not. I mean, if you're stuck with the Twombly standard. You have to have a 51 – I call it 5149 under Twombly. And we've done 51. We've got all studies but one in our favor saying they come only from the company. But do you have that for these plaintiffs? I mean, I'm puzzled by this because Judge Patel made it pretty clear what she wanted. And I presume you had reasons for not giving her exactly what she wanted to get past the pleading stage. And I can only assume it pertains to these particular plaintiffs. Well, no. I think it's not required under the rule, either Rule 8a or the other. No, no, no. You're not focused on my question. Whether it's required or not, she made it very plain what she wanted, and you declined to give it to her. And I have to think that's because you couldn't prove it up for these particular plaintiffs. That's what she found to be the problem. Well, it's equally plausible to believe that the doctors just would not cooperate with us. Right. But let me back up. And I understand, and the pleading rule has changed with Iqbal and Twombly. And, of course, it's always been very strict on fraud type of claims. But, you know, Judge Patel put it to you, and as Judge Ezra pointed out, you could have taken perhaps a pre-suit deposition or some discovery on that. I think what, you know, Judge Clifton's asking, and we have, can you prove this? It sounds like you can't at the end of the day. No, let me give you an example of why I believe we can't. Can you prove it for these plaintiffs? Yes. E.R., let me give you one example. 208 and 209. Here's the allegation with respect to Plaintiff Stevens. Dr. Wolcott was told by the intermune sales representatives who visited him that based on clinical trials, Act Immune was promising in the treatment. Based upon the sales representative's statement, Plaintiff Stevens and Dr. Wolcott agreed that she would be treated for IPF. So here you have a doctor saying, I take the sales pitch as true. I talk about it with the plaintiff, and they agree to go ahead. That's causation. That's plausibility. Right there. And you, Judge Thomas, made a comment in a fraud case. We haven't got into this, but we did in the briefs. The unlawful and unfair prong here are not fraud cases. And if you look at that footnote in Tobacco II, they said, yes, in an affirmative representation case, we're going to require reliance, but it's not going to be required in other types of cases under the UCL. Now, they haven't answered what the standard is, and I don't think there's a case out there that does. I'll confess that. But it's clearly different than the type of reliance in their mind in an unlawful and unfairness case than what Judge Patel was imposing here. May I switch topics for a minute? I don't know. I understand your general theory, except with respect to Genentech. I don't understand your theory on Genentech. I don't see – I've read your pleadings. I've read your briefs. I don't see a plausible cause of action against them. So persuade me that you have a good cause of action against them. Well, I have nothing other than to say what we put in our briefs, Your Honor. Okay. Thank you, unless there's other further questions. Thank you. May it please the Court, I'm not willing to concede that Iqbal applies with respect to this diversity action. I don't know if there's a case that is out there determining that issue, but Gihad does not concede it. With respect to Genentech, the issue is whether they had actual knowledge of the marketing efforts. For purposes of the statutory claims, let's talk about the unjust enrichment account, which is a restitutionary issue. If Genentech receives royalties, which they did, which were the fruit of ill-gotten gains, I believe that the common law unjust enrichment claim says whether Genentech was wrong, whether they participated or what have you, to the extent that my client pays, then we should be able to restitute that first. Secondly, the question about whether they lacked actual knowledge, there are allegations in the complaint, and there's testimony from the criminal trial that says that from David Corey, Intermune's senior vice president in marketing of sales. As I said, at trial testament under oath, Dr. Harkinen was excited about the 1999 study. He shared it with me, a letter he drafted to Nick Simon, who at that time was at Genentech, outlining the off-label sales opportunity per year of $422 million. Now, same trial, same witness says that nobody could have believed, based upon the fact that the studies were out there both in the foreign market and the United States market, the foreign market was less than $10 million a year. The United States market was up to $142 million at its peak. He says no one could have concluded that the astronomical United States sales, particularly Genentech, who, of course, developed this product, recognized its narrow indication. And so the fact that the United States market was more than $142 million, and the company was not aware of it, didn't market it. Prior to the licensing, okay? They had the product, then they licensed it, recognizing that it had a very narrow indication. But you agree that Genentech had no direct communication with physicians. There's no proof of that on the record. There's no proof of that on the record. But the marketing reports you'll see in the record, part of the licensing arrangement was that marketing reports were shared with Genentech periodically. Clinical trial reports were shared. What should they do to aid and abet? What they – well, they aid and abetted by marketing and receiving. You just told me they didn't market. I'm sorry. Well, by reviewing the marketing materials, by receiving the funds, and by having knowledge, with respect to this, I haven't heard anything that suggests that they took action to aid and abet. You may suggest they had a pot of money pouring into their laps, and maybe could have figured out why the pot of money was pouring into their laps. Well, I think – But what did they do to aid and abet the marketing? I think that with the facts that Genentech, as we allege and as the testimony was at the criminal trial, had knowledge by virtue of being informed by Dr. Harkonnen of the off-label marketing opportunities, by virtue of the amount of revenue that it was receiving in the United States as compared to foreign markets, and by – But knowledge is enough for your purposes. And knowledge with – they also participated by marketing. I'm still waiting. By manufacturing. All I'm hearing is empty language. Participating in marketing, only they didn't do anything. No, no, no. Manufacturing. Right. And they received the money. So we believe still under an unjust enrichment theory it's a viable cause of action, even if the court disbelieves the aiding and abetting. I didn't mean to be so blunt, but I just find it's one step back on Genentech. And in reading everything, it seems it's a very tough case to make, I think. Your best argument, if you wanted to point us in the record, is what you would have us read against the theories against Genentech. Where would you point us? I would point you to the criminal trial testimony. Okay. That's referred to at page 26 of the reply brief. Okay. With respect to the idea that there was a diversity of clinical opinions in the literature, that's not what we allege. In fact, at Geha's reply brief, we did in tabular formation exactly what was alleged. All of the studies, all of the presentations, with respect to the 1999 Austrian study, there were nine people who were evaluated in that study. That study itself said it was preliminary. That study called for additional studies to determine whether or not this actually worked. That study also in an editorial in the New England Journal of Medicine said, we can't rely on this because it's not statistically significant. That is the closest thing in the record that Intermune has to any independent clinical study. But we also allege that Intermune had a hand in participating in making that pilot study. Nine people with what other people later said was not IPF because their lung function, people were excluded from the 1999 study who had less than 45 percent of their lung capacity. Other researchers later said, well, those are the people with the IPF themselves. So that's the only study, when you scour the record in terms of the clinical information that's out there, you'll see that's it, that nine-member study which has no scientific significance, as others later said. So there is not, as in other off-label cases, that we've seen a diversity of clinical opinion out there. Every positive study in this case was authored or financed by Intermune. Thank you, counsel. It's a very interesting case. Thank you all for your presentations. The case will be submitted for decision. And we'll proceed with the last case on the oral argument calendar, which is Smith v. Ford Motor Company. Thank you.
judges: Ezra, Thomas, Clifton